**In the United States District Court**
**for the District of Kansas**

---

Case No. 25-cr-40018-TC

---

UNITED STATES OF AMERICA,

*Plaintiff*

v.

LOCKIE BLAIR ET AL,

*Defendant*

---

## MEMORANDUM AND ORDER

A grand jury indicted Lockie Blair and David Simpson with possession of cocaine with the intent to distribute in violation of 21 U.S.C. § 841(a)(1) and reentry of a removed alien in violation of 8 U.S.C. § 1326(a) & (b)(1). Doc. 1. Invoking the Fourth Amendment, they jointly move to suppress the evidence uncovered during a traffic stop. Doc. 36. For the following reasons, that motion is denied.

### I

### A

The Fourth Amendment protects the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV; *see also New Jersey v. T.L.O.*, 469 U.S. 325, 334 (1985) (recognizing incorporation against the states). Absent a recognized exception, the Fourth Amendment prohibits suspicionless seizures or warrantless searches that violate a person's objectively reasonable expectation of privacy by invading a constitutionally protected space or thing. *United States v. Jones*, 565 U.S. 400, 406 (2012); *see also United States v. Ackerman*, 831 F.3d 1292, 1307 (10th Cir. 2016). Traffic stops are seizures for Fourth Amendment purposes, *United States v. Pettit*, 785 F.3d 1374, 1379 (10th Cir. 2015), and in a traffic stop "a passenger is seized as well and so may challenge the

constitutionality of the stop." *Brendlin v. California*, 551 U.S. 249, 251 (2007).

A warrantless stop is valid where the officer has reasonable suspicion to believe that a traffic violation occurred. *Kansas v. Glover*, 589 U.S. 376, 380 (2020). In particular, the officer must have "a reasonable articulable suspicion that this particular motorist violated any one of the multitude of applicable traffic and equipment regulations of the jurisdiction." *United States v. Salas*, 756 F.3d 1196, 1201 (10th Cir. 2014) (quotation marks omitted). The stop also must be "reasonably related in scope to the circumstances which justified the interference in the first place." *United States v. Morales*, 961 F.3d 1086, 1090–91 (10th Cir. 2020).

Ordinarily, the traffic stop is circumscribed by the traffic violation giving rise to the initial encounter. That means officers may conduct unrelated inquiries during a stop only if that conduct does not prolong the stop. *United States v. Frazier*, 30 F.4th 1165, 1173 (10th Cir. 2022) (citing *Rodriguez v. United States*, 575 U.S. 348, 355 (2015)). For example, it is accepted that officers may reasonably inquire as to the driver's license, automobile's registration and proof of insurance, identity of the individuals, and driver's travel plans. *United States v. Cates*, 73 F.4th 795, 806 (10th Cir. 2023) (citations omitted). But once the mission of the stop has concluded, the motorist is generally free to leave. *Morales*, 961 F.3d at 1091. If an officer develops (at the very least) reasonable suspicion of other illegal activity distinct from the traffic violation, the stop can continue to explore the basis of that suspicion. *See United States v. Munoz*, 162 F.4th 1210, 1219 (10th Cir. 2025); *United States v. Frazier*, 30 F.4th 1165, 1174 (10th Cir. 2022) (recognizing the more stringent probable cause standard also justifies extending a traffic stop).

As a general matter, the authority to detain a motorist while investigating reasonable suspicion does not include the right to search the vehicle. Instead, a search of the vehicle must be justified by, for example, probable cause. *United States v. Phillips*, 71 F.4th 817, 823 (10th Cir. 2023); *see also United States v. Pinder*, 121 F.4th 1367, 1371 (10th Cir. 2024) (allowing contemporaneous search incident to a lawful arrest). "Probable cause to search a vehicle is established if, under the totality of the circumstances, there is a fair probability that the car contains contraband or evidence." *Phillips*, 71 F.4th at 823 (quotation marks omitted). When an officer smells drugs, such as marijuana emanating from the vehicle, that observation is "entitled to substantial weight in the probable cause analysis and can be an independently sufficient

basis for probable cause." *Id.* (quotation marks omitted). Additional observations—such as nervous behavior and vague travel plans—strengthen the existence of probable cause. *See Munoz*, 162 F.4th at 1220–22.

### B

In February 2025, Junction City police department K-9 Officer Nicholas Blake utilized the automatic license plate reader system to datamine for vehicles he found to be engaging in suspicious travel.[1] Specifically, he was searching for vehicles that were engaged in short trips to and from Southern California. From that search, Blake received an alert from the ALPR system regarding a white Buick Envision that had entered his jurisdiction. Historical license plate data available to Blake indicated that the Buick had made a quick trip of 44 hours from Indiana to Southern California before travelling back east through Kansas. This travel history aroused Blake's suspicion that the Buick might be engaged in criminal activity, including transportation of illegal drugs, a suspicion he testified was reinforced by his subsequent discovery that the vehicle had been rented. In Blake's training and experience he had come to understand that rental cars that made trips to Southern California with such quick turnarounds covering this scale of distance had a higher probability of involvement in criminal activity because, among other things, they tended to be more reliable and were not at risk of forfeiture.

Blake went looking for and eventually spotted the Buick travelling eastbound on Interstate 70. Upon observation, he saw the Buick following within one second of a semi-truck, a distance he deemed to be a violation of K.S.A. § 8-1523(a), which prohibits following another vehicle too closely. Blake then initiated a traffic stop of the Buick based on this observation.

When Blake first walked up to the passenger side of the vehicle, Lockie Blair was driving, and David Simpson was in the passenger seat. Blake informed them he had stopped them for following too closely and asked for identification. Upon questioning, Blair and Simpson stated that the vehicle was a rental. The vehicle's rental agreement showed that Simpson's girlfriend had rented it on February 23 in

[1] The following facts were found based on the witnesses' testimony and the evidence produced at the suppression hearing.

Pennsylvania, and that return of the vehicle was required a few days after the stop. When asked why they were in Kansas, Simpson paused before replying they had attended a wedding in Las Vegas. Blake observed that during this time Blair's heightened pulse was visible in his stomach and Simpson's near his carotid artery. Blake later described their condition as "freaking out."

During this initial encounter, Blake smelled marijuana coming from the vehicle. As reflected on the video recorded by his body-worn camera played at the hearing, he contemporaneously indicated this both verbally and with a hand signal while returning to his patrol vehicle. His report later indicated it was raw marijuana. Although Blake is a K-9 officer and had his police K-9 in the vehicle, he never deployed the K-9 to confirm the smell at any time. These circumstances, including the inconsistency of stated travel history with license plate data and the smell of raw marijuana, aroused Blake's suspicions of criminal activity.

Blake returned to his vehicle and reported the license information to dispatch. While both Blair and Simpson—Jamaican nationals present illegally in the United State—had given Blake false identification, this falsehood was not revealed at the time of the stop and search. Blake was shortly joined by his partner, Officer Thomas Umeck. Umeck additionally noted the "strong" odor of marijuana.

Blake and Umeck instructed Blair and Simpson to exit the vehicle and informed them that they would be conducting a search based on their detection of marijuana odor. As Blair exited the vehicle, he told Blake that the pair had been smoking marijuana. That search ultimately led Blake to the rear internal cargo area of the Buick, which was part of the same shared space as the passenger area. Upon visual and physical inspection of the spare tire in that cargo area, Blake determined the tire had something inside it. Without further search at the scene, the Buick was transported to the police station. There, law enforcement ultimately located 2.5 kilograms of cocaine within the spare tire. They additionally discovered a small container of raw marijuana in the passenger side rear door compartment and $6,000 in cash.

A grand jury indicted Blair and Simpson on one count of possession of cocaine with the intent to distribute in violation of 21 U.S.C. § 841(a)(1) and one count of reentry of a removed alien in violation of

8 U.S.C. § 1326(a) & (b)(1). Doc. 1.[2] Blair and Simpson now move to suppress the drugs. Principally, they contend the initial stop was unlawful, ALPR usage is unconstitutional, the stop was prolonged unlawfully, and probable cause to search did not extend to the spare tire. Doc. 26. The Government opposes each argument. Doc. 37. An evidentiary hearing was held on October 20, where Blake and Umeck testified.

## II

Blair and Simpson seek suppression of the drugs found in the vehicle they were driving, claiming that the stop was unlawful at its inception and that the search that followed was impermissible. But Blake had reasonable suspicion to initiate the stop based on the observed traffic violation and probable cause to search for the source of the perceived marijuana odor. Accordingly, Blair and Simpson's motion is denied.

### A

Blair and Simpson argue that the stop was unlawful. That argument is two-fold. First, Blair and Simpson argue that Blake lacked reasonable suspicion to initiate a traffic stop based on his observation that the vehicle Blair and Simpson were driving violated Kan. Stat. Ann. § 8-1523(a), meaning it was invalid at its inception.[3] Doc. 36 at 17-19. Second, Blair and Simpson argue that their Fourth Amendment rights

---

[2] All document citations are to the document and page number assigned in the CM/ECF system.

[3] Blair and Simpson argue they both have standing to challenge the search and seizure, despite neither of them appearing on the rental agreement. At the hearing, the Government conceded for purposes of argument that both had standing. As a result, it is assumed that both Blair and Simpson have standing. *See Armendariz v. City of Colorado Springs*, 169 F.4th 1036, 1065 n.15 (10th Cir. 2026) (declining to address Fourth Amendment standing when it was not challenged because "standing is not jurisdictional"); *see also United States v. Dewitt*, 946 F.2d 1497, 1499–500 (10th Cir. 1991) (quoting *Steagald v. United States*, 451 U.S. 204, 209 (1981)) ("[T]he issue of fourth amendment standing could be waived if the government has 'failed to raise [it] in a timely fashion during the litigation.'") (alterations in original).

were violated because Blake's attention was drawn to their vehicle based on his review of ALPR data. Neither argument has merit.

**1**

A warrantless traffic stop is a seizure that must be justified by reasonable suspicion of a traffic violation. *Kansas v. Glover*, 589 U.S. 376, 380 (2020). In particular, the officer must have "a reasonable articulable suspicion that this particular motorist violated any one of the multitude of applicable traffic and equipment regulations of the jurisdiction." *United States v. Salas*, 756 F.3d 1196, 1201 (10th Cir. 2014) (quotation marks omitted). Reasonable suspicion is determined objectively from the entirety of the circumstances and without regard to the officer's motivations. *Id.*

Blake testified that he initiated the traffic stop because he observed the defendants' Buick violating Kan. Stat. Ann. § 8-1523(a). That statute prohibits drivers following the vehicle in front of them "more closely than is reasonable and prudent" and requires driving with "due regard for the speed of such vehicles and the traffic upon and the condition of the highway." K.S.A. § 8-1523(a). The Tenth Circuit has expressly and repeatedly held that an officer observing a vehicle following within two seconds of the vehicle in front of them provides reasonable suspicion for a traffic stop under § 8-1523(a). *See United States v. Hunter,* 663 F.3d 1136, 1143 (10th Cir. 2011) ("[W]e have specifically approved the two-second rule as supporting reasonable suspicion to effect a traffic stop under § 8–1523(a)."). Blake credibly testified he observed the Buick following less than two seconds behind the vehicle in front of them, giving him reasonable suspicion for the stop and there is no evidence to the contrary.[4] That is sufficient to justify the stop at its inception. *Hunter*, 663 F.3d at 1143.

**2**

Even after accepting that the stop was supported by reasonable suspicion, Blair and Simpson nonetheless contend that the fruits of the

[4] Blair and Simpson initially argued that the stop lacked reasonable suspicion but both conceded at the hearing that the evidence was sufficient to justify the stop at its inception and that they were no longer pressing the argument originally asserted in the motion to suppress. As a result, there is no dispute that Blake's stop was justified at its inception.

stop and subsequent search should be suppressed because Blake's attention was drawn to them based on his warrantless use of historical license plate data. Doc. 36 at 12. Relying on *Carpenter v. United States*, 585 U.S. 296 (2018), and pointing to his use of data derived from stored information collected by automated license plate readers from Kansas to the California/Nevada border and back,[5] they argue that Blake's "effortless[ ]" vehicle tracking "for days on end over hundreds of miles" brings this case within *Carpenter's* ambit. *Id.* at 14. That argument has several deficiencies.

**a**

Before addressing the argument and its deficiencies, it is helpful to understand and describe the circumstances of historical license plate reader data. Generally speaking, the automated license plate reader system—known as "the ALPR system"—is comprised of a series of roadside cameras that photograph vehicles and their license plates when those vehicles, travelling on public roadways, pass by a camera site. *United States v. Mapson,* 96 F.4th 1323, 1334 (11th Cir. 2024); *see also* Eugene Volokh & Orin Kerr, Free Speech Unmuted: Flock Cameras and the Fourth Amendment with Orin Kerr (Hoover Institution 2026) (discussing ALPR systems and the surrounding legal and policy issues surrounding its use). These cameras operate twenty-four hours a day, seven days a week and photograph all vehicles that pass them. *United States v. Jackson,* 2025 WL 1530574 at *1 (D. Kan. May 29, 2025). Together, they track the direction and general nature of vehicular travel. *Id.* The information is then collected and compiled by private companies which sell data access to law enforcement. *Mapson,* 96 F.4th at 1334. Law enforcement can subsequently retrieve this data through travel parameters or searches on particular vehicles. *Id.* at 1335. The historical data is kept and can be retroactively accessed for a significant amount of time. *United States v. Porter,* 170 F.4th 381, 387 (5th Cir. 2026) (describing how the ALPR system allows law enforcement to track a

[5] As Blake testified at the hearing, he has no access to ALPR cameras on the California border. That is likely because the State of California does not permit data sharing with federal agencies or other states. Cal. Civ. Code § 1798.90.5 *et seq*; CA DOJ Information Bulletin 2023-DLE-06 and CA DOJ General Order 2023 (limiting the definition of "public agency" within the statute to in state agencies).

"person's whereabouts" without determining in advance a need for surveillance).

The third-party ALPR system used by Blake and the Junction City Police Department is called Vigilant and is currently owned by Motorola. According to Blake's testimony at the hearing, Vigilant serves as a database that collects and processes historical license plate data, making it accessible to consumers. Different law enforcement jurisdictions give Vigilant access to their camera systems and license plate data, which Vigilant currently retains for ten years. Blake said the Junction City Police Department pays for access to Vigilant and, in return, its officers gain unlimited search access to the stored data. Blake noted that some states and jurisdictions, such as California, do not allow ALPR cameras to share such data, but most do.

In stopping Blair and Simpson, Blake testified that he began by engaging in the process of datamining on the Vigilant system. He configured it to notify him of the license plates of vehicles that met certain criteria that he deemed suspicious. In this case, he was looking for vehicles that that travelled long distances to and from Southern California. For those that fell within the parameters, Blake himself ran the license plate number through a different database in order to gather further information, including the registered owner and whether the vehicle was a rental.

This process drew Blake's attention to Blair and Simpson's Buick. He therefore set the ALPR system to alert him should the vehicle reenter his area of responsibility. It did so and he proceeded to look for it. As noted above, once he saw it on the road, he observed a traffic violation and initiated the stop at issue.

Blake's method of identifying Blair and Simpson's vehicle was not beginner's luck. Rather, it is a method he employs frequently. He testified that his process has led him to conduct over 274 successful narcotics and currency stops.

On the strength of that record, Blake testified that he runs a side business training other law enforcement in ALPR usage. He markets himself as experienced in ALPR searches and stops and notes that law enforcement customers hear about his business through both word of mouth and electronic flyers. His business's customers are almost entirely other law enforcement officers and agencies. If retained, Blake will teach these officers or agencies his knowledge and experience with

the ALPR system, charging $5,000 for a single day class and $8,000 for a two-day class. *See* Doc. 36 at 4 n.5. The curriculum, as he testified, includes Blake teaching his customers how to use ALPR datamining techniques, how to identify suspicious vehicles, and even takes them into the field for a potential stop.

**b**

Blair and Simpson's argument is doomed by several defects. *First*, it does not appear that there is a Fourth Amendment search when accessing historical license plate reader data. In order to maintain a Fourth Amendment challenge, Blair and Simpson must point to a subjective expectation of privacy in the Buick's license plate and travel that society is prepared to recognize as reasonable. *Carpenter,* 585 U.S. at 304. But any attempt to do so appears to be foreclosed by existing precedent.

In *United States v. Knotts*, the Supreme Court considered whether warrantless monitoring of a beeper—a rudimentary location tracking device—violated the Fourth Amendment. 460 U.S. 276, 280 (1983). This device collected data on the defendant's direction of travel, usage of particular roads, and final destination. *Id.* at 281-282. The Court rejected the defendant's argument that it violated the Fourth Amendment, holding that this information was voluntarily conveyed to the public through vehicle travel on public roadways and thus entailed no privacy interest. *Id.* at 281-282.

The Court next considered monitoring vehicle traffic in *United States v. Jones*, 565 U.S. 400 (2012). In *Jones,* the Court considered whether the act of attaching a GPS device to an individual's vehicle without a warrant, and the resulting location tracking on public roads, violated the Fourth Amendment. *Id* at 402. While Court held this was a Fourth Amendment search, it did so based on the notion that the officers violated Jones' common-law trespassory interest rights. *Jones,* 565 U.S. at 400. Consequently, *Jones* turned on a "physical intrusion" by the government onto private property and did not consider or extend the privacy analysis to public road surveillance. *Id.* at 405.

In *Carpenter,* the Court confronted whether individuals have a legitimate Fourth Amendment expectation of privacy in cell-site location information. *Carpenter,* 585 U.S. at 316. At issue was the Government's collection of 127 days of detailed cell phone location data about specific defendants from wireless carriers. *Id.* at 301-03. The Court found

such collection unlawful, as there is a privacy interest in an individual's location and movements. *Id.* at 311. Because the cell-site location data provides "near perfect surveillance" of an individual's patterns of life, including in private locations, it violates the individual's privacy interest. *Id.* at 311-12. But, as relevant here, the Court reiterated its holding in *Knotts* that travel on public roadways implicates no privacy interest, distinguishing the automotive journey of *Knotts* from the twenty-four hour individualized surveillance based on cell-site location data. *Id.* at 306-07.

In *Chatrie,* the Supreme Court confronted the Fourth Amendment privacy implications of another new technology, geofences. *Chatrie v. United States,* 609 U.S. 605 (2026). Geofences are a particular kind of search of cell-site data that is used when law enforcement knows the location and time of a crime but lacks a particular suspect. *Id.* at 610. Law enforcement designates an area known as a geofence, which is a virtual perimeter around an area of interest, and collects data about all the cell phones that were present within the geofenced area at the time of the crime. *Id.* The resulting data allows granular historical tracking of an individual's movements, including into private locations. *Id.* at 625-26. The Court held that this type of search infringed on the individual's protected privacy interest, raising the same individual privacy concerns as *Carpenter*. *Id.* at 625.

Some may suggest *Chatrie* is directionally significant in that the Court seems troubled by the use of modern technology. Indeed, *Chatrie* raised noted concerns about advances in surveillance technology, as well as the increasing availability of historical surveillance data, *id.* at 626, noting that these developments in surveillance might ultimately render the *Knotts* rule unworkable. *Id.* at 630-31. Nonetheless, the Court ultimately reaffirmed *Knotts'* holding that surveillance "confined to public roads" does not implicate the same privacy interests as individual monitoring. *Chatrie,* 609 U.S. at 631 (quoting *Knotts,* 460 U.S. at 281).

Although the Supreme Court has not yet applied these principles to license-plate data, other courts have. And they have almost uniformly held that there is no Fourth Amendment privacy interest in

vehicle travel on public roads nor in license plate information.[6] For example, the Tenth Circuit held that a motorist lacks a privacy interest in his or her license plate information because it is, by its nature, in the public view. *United States v. Walraven*, 892 F.2d 972, 974 (10th Cir. 1989); *see also New York v. Class*, 475 U.S. 106, 114 (1986) ("[I]t is unreasonable to have an expectation of privacy in an object required by law to be located in a place ordinarily in plain view from the exterior of the automobile."). More recently, the Fifth Circuit rejected the very argument that Blair and Simpson make in this case concerning datamining of ALPR data, noting that there is no privacy interest in a license plate number and that license plate readers are outside *Carpenter*'s reach. *United States v. Porter*, 170 F.4th 381, 387 (5th Cir. 2026).[7] Other circuits to confront the ALPR issue resolved the disputes on standing and evidentiary exception grounds, respectively. *See United States v. Yang,* 958 F.3d 851, 861 (9th Cir. 2020); *United States v. Mapson,* 96 F.4th 1323, 1334-34 (11th Cir. 2024).

As noted, a contrary conclusion appears inconsistent with the Fourth Amendment as currently understood. In particular, the ALPR system differs in a material way from those surveillance techniques considered in *Carptenter* and *Chatrie*: it does not permit twenty-four hour surveillance of an individual's comings and goings, it does not extend into private residences, doctor's offices, [and] political headquarters," *Carpenter,* 585 U.S. at 311, and it captures only a photograph of a vehicle travelling on a public roadway. Moreover, as Blake testified at the hearing, these cameras are often separated by miles and miles of roadway and the ALPR system is incapable of monitoring an individual's activity off the public highway such as within their own home. In fact, it does not even record who is driving the vehicle. These aspects of ALPR datamining appear to fall most comfortably on the *Knotts* side of the *Knotts-Jones* divide.

---

[6] After briefing closed but before the suppression hearing, another court in this circuit held that accessing ALPR data constituted an unlawful search if obtained without a warrant. *See United States v. Kyle,* 2026 WL 2958728 (N.D. Okla. Oct. 1, 2026). This is the only authority Blair and Simpson mentioned that supported their argument.

[7] The Fifth Circuit heard a separate case dealing with the constitutionality of ALPR usage on October 5, 2026. *United States. v. Brownlee,* No. 25-10855. It has not yet been decided.

*Second*, there is a causation problem. In *United States v. Whren*, the Supreme Court held that an officer's subjective motivations for a stop are immaterial in a Fourth Amendment analysis. 517 U.S. 806, 813 (1996). That rule has significant bite in this case. Blake, Umeck, and sometimes both Blake and Umeck together have testified in suppression hearings that they were alerted to a particular vehicle approaching their area of responsibility, that they took steps to observe that vehicle in the hopes that they were able to witness a traffic violation so that they could lawfully initiate a traffic stop, and then, upon witnessing that violation, initiated the stop leading to the discovery of illegal narcotics. *See*, *e.g., United States v. Jones,* 2025 WL 2996793 (D. Kan. Oct. 24, 2025) (Umeck); *United States v. Oakes,* 2026 WL 1030818 (D. Kan. Apr. 15, 2026) (Blake); *United States v. Palmer*, 25-40011 (D. Kan. Apr. 27, 2026), Doc. 37-1 (Blake and Umeck); *United States v. Tsegay,* 2026 WL 1214609 (D. Kan. May 4, 2026) (Blake); *United States v. Duca,* 2026 WL 1377711 (D. Kan. May 18, 2026) (Blake). In each of the previous cases and in this one, too, it is evident that these officers are identifying vehicles that fit within a specified range of conduct based on their review of historical data (e.g., rapid west coast and return trip) in an effort to investigate what they believe will likely uncover evidence of unlawful drug trafficking.

*Whren* effectively insulates their conduct from review. It matters not that these officers' intent is to engage in enhanced enforcement techniques that result in identifying a vehicle and seeking even the most minor traffic violation to justify their pretextual traffic stop to pursue their general law enforcement goals. *Whren,* 517 U.S. at 814; *see also United States v. Meadows,* 970 F.3d 1338, 1341 (10th Cir. 2020) (noting *Whren's* sanctioning of pretextual traffic stops where an independent traffic violation provided probable cause); *United States v. Wilkinson,* 633 F.3d 938, 943 (10th Cir. 2011) (acknowledging that even a nearly expressly pretextual stop poses little problem when an independent traffic violation was present). And, once they have identified a lawful basis for the stop—typically an alleged infraction of one of the many laws applicable to the general public—the stop proceeds without regard to any prior subjective intent. *Whren,* 517 U.S. at 812-14; *see also United States v. Winder,* 557 F.3d 1129, 1134 (10th Cir. 2009) (noting that the officer's subjective belief is "irrelevant" in the stop analysis).

Blair and Simpson seemingly invoke the fruit-of-the-poisonous-tree doctrine in an attempt to avoid this issue. Yet that doctrine requires suppression of evidence only in situations where the unlawful

search is the but-for cause of the discovery, and there is a factual nexus between the two. *U.S. v. Chavira,* 467 F.3d 1286, 1291 (10th Cir. 2006). And the burden is on Blair and Simpson to show this connection exists. *United States v. Nava-Ramirez,* 210 F.3d 1128, 1131 (10th Cir. 2000). They did not do so here.

That rule does not apply because the traffic violation was an independent source for the traffic stop. The Tenth Circuit has held that where a lawful independent source provides a constitutional basis for a search, evidence need not be excluded as fruit of an unlawful action. *United States. v. Forbes,* 528 F.3d 1273, 1279 (10th Cir. 2008). While the independent source doctrine generally applies when there are two separate investigations, the *Forbes* court applied it in instances where an unlawful search was immediately followed by a lawful canine sniff. *Id.* at 1279. Because the canine sniff was a "genuinely independent source," for the evidence discovered, that it followed as part of the same sequence of events as an unlawful search did not necessitate suppression of the evidence. *Id.*

Blake's conduct follows the same pattern. No matter the lawfulness of his ALPR usage, his lawful observation of a traffic observation constitutes the same kind of independent source as the canine sniff of *Forbes*. In other words, that observation provides a separate and independent constitutional basis for the traffic stop.

*Third*, there is an administrability concern. Stating a rule that would allow Blair and Simpson to succeed even if the use of historical ALPR data were unconstitutional when there is an admitted traffic violation would be difficult to administer and leave important questions unresolved.[8] For example, would *Whren*'s prohibition on delving into the officer's subjective intent apply only generally unless there was reason to believe the officer tapped into historical license plate data? And if so, whose burden would it be to show such usage? Moreover, how much historical data would be too much—two hours, two days, or two weeks? And for what purposes would license plate data be permissible? After all, license plates are issued by state authorities to maintain safe operations of the roadways and track which vehicles may lawfully be on those public roadways and thoroughfares. *Delaware v. Prouse,* 440 U.S. 648, 660-661 (1979) (noting license plates provide evidence of the lawfulness of the vehicle usage). And reliance on that data is typically

[8] Neither their briefs nor their oral argument proposed any rule whatsoever.

perceived as a common and commonly accepted law enforcement practice. *Compare, e.g., Glover*, 589 U.S. at 379 (noting that the officer used license plate data to confirm driver's license data indicated no registered owner of the vehicle had authority to lawfully operate the vehicle without discussing the proper use or future misuse of license plate data); *with* Brief for Respondent, *Glover,* 589 U.S. 376 (2020) (No. 18-556), 2019 WL 4167080, at * 49-50 (warning of the misuse of license plate data); Brief for Electronic Privacy Information Center et al. as *Amici Curiae*, *Glover,* 589 U.S. 376 (2020) (No. 18-556), 2019 WL 4256216, at *14-22 (arguing in support of Respondent's ALPR concerns).[9] And finally, does accessing ALPR data immunize a driver from any enforcement of traffic laws? In this case, that would mean Blake would be prohibited from initiating a traffic stop committed in his presence. That seems an unlikely result. *Prouse,* 440 U.S. at 659 (1979) (noting the primary way to enforce traffic laws is through stopping violators).

* * *

Blair and Simpson's motion challenging the use (and, perhaps, misuse) of historical license plate date presents several compelling concerns. It is possible that the Supreme Court will one day address these

---

[9] It seems Blair and Simpson's arguments, like those made in the aforementioned amicus brief, are more generic, attempting to raise broad constitutional concerns about the alleged omnipresent surveillance of the ALPR system. Doc. 36 at 14. But the focus of the Fourth Amendment's privacy rights are inherently individual. *Carpenter,* 585 U.S. at 303. While the Supreme Court has cast doubt upon indiscriminate mass surveillance at all points of the individuals' life, it has not extended that concern to surveillance from a fixed point on public roads. *See Chatrie,* 609 U.S. at 626-627 (discussing monitoring "the movements of many individuals…at the click of a button." (quotation marks omitted)). Indeed, the type of information Blake obtained from his ALPR data contained only the type of information that the beeper in *Knotts* provided, including direction of travel, the roads used, and a general sense of the final destination. *Knotts,* 460 U.S. at 281-82. Unless and until the Supreme Court or Tenth Circuit reach a different conclusion, the holding of *Knotts* seems to foreclose Blair and Simpson's concern. *Chatrie,* 609 U.S. at 631 (quoting *Knotts,* 460 U.S. at 281); *see also United States v. Maloid*, 71 F.4th 795, 808 (10th Cir. 2023) (describing the constraint vertical stare decisis imposes on lower courts to apply the Court's precedent), cert. denied, 144 S. Ct. 1035 (2024).

issues and resolve the dispute as they request. But, as things stand now, the law does not appear to support their argument. As a result, their motion must be denied.

**B**

Blair and Simpson's objection to the search after the stop also has two facets. One concerns their claim that Blake lacked probable cause to search the vehicle, claiming that the facts known to Blake failed to meet the probable cause standard. The other contends that even if Blake had probable cause to search their vehicle, he exceeded that scope by accessing the rear cargo area where the spare tire (which contained the drugs they seek to suppress) was stored. Doc. 36 at 19. Again, both fail.

**1**

Blair and Simpson argue Blake's marijuana sniff did not suffice for probable cause because they were not smoking marijuana, no raw marijuana was ever found, and Blake did not originally indicate the marijuana he discovered was raw. Doc. 36 at 21. That is wrong on multiple accounts.

To begin with, raw marijuana was present and its usage was recent. Blake credibly testified and body camera footage showed that he detected the odor of raw marijuana coming from within the vehicle. Umeck did too. That alone is sufficient to provide probable cause to search the vehicle. *United States v. Phillips*, 71 F.4th 817, 825 (10th Cir. 2023). And then, when Blake searched the Buick fully at the police station, he located a plastic container of marijuana in the passenger side rear door pocket. Doc. 37 at 6. While Blair and Simpson are correct that Blake did not specify at the time of the search that the odor he described was raw (as opposed to smoked) marijuana during the roadside encounter, that does not minimize that both Blake and Umeck later confirmed that they smelled "a strong odor of raw marijuana" upon encountering the defendants. Doc. 37 at 5; *United States v. Vasquez-Castillo,* 258 F.3d 1207, 1213 (10th Cir. 2001) (finding that the odor of marijuana strongly supported probable cause).[10]

---

[10] Moreover, Blake did not need to use his K-9 to verify his initial sniff. *West*, 219 F.3d at 1178*; Contra* Doc. 36 at 22.

One may reasonably question—and Blair and Simpson do—the veracity of Blake and Umeck's claim that they smelled raw marijuana. For instance, Blair and Simpson called a witness to opine that the quantity of raw marijuana ultimately found and the sealed nature of the plastic container in which it was found made it unlikely Blake could smell the marijuana from outside the vehicle. That testimony was based largely on his clinical observations, included several acknowledgements that the circumstances of the stop could undermine his testimony, and fails to take into consideration Blair's admission that the pair had just smoked marijuana, suggesting greater quantities of raw marijuana may have been recently present, resulting in a lingering odor Additionally, the pair assert that Blake's testimony should be rejected because he has not only a law enforcement desire to ferret out crime but also a pecuniary interest to further his side business that capitalizes on the amount of drug seizures that he makes. These arguments attempt to challenge the veracity of Blake's statements but amount to no more than speculation. The sworn testimony adequately supports Blake and Umeck's contention that they observed the smell of raw marijuana. And, indeed, Blair admitted on body camera recording to consuming marijuana within the vehicle, indicating the container had likely been open for some time, undermining Miller's conclusion.

In addition to the odor of raw marijuana, additional factors supported Blake's determination that he had probable cause to search the Buick. For instance, he testified that he observed Blair and Simpson's extreme nervousness, claiming that he was able to see their pulses in their neck and heavy breathing. That adds to the probable cause calculus. *See United States v. Ozbirn*, 189 F.3d 1194, 1200 (10th Cir. 1999) (holding nervous behavior reinforces probable cause). In addition, the nature of the vehicle's trip was suspicious. He knew from the historical license plate data that the Buick had made a quick roundtrip to California and was returning eastbound. Blake testified that in his experience only drug couriers make such trips, and that where, as here, the vehicle had made quick long-distance trips, it was "almost certain" that the vehicle was involved in criminal activity. *See*, *e.g.*, *United States v. Cortez*, 449 U.S. 411, 418 (1981) (holding that officers can rely on inferences drawn from their training and experience not obvious to the ordinary person). And then there are the inconsistent travel plans. Contrary to Blake's ALPR data, Blair and Simpson claimed that they were returning from a wedding in Las Vegas and made no mention of being in California. This inconsistency further supports Blake's probable cause. *See Ozbirn*, 189 F.3d at 1200.

**2**

Blake's probable cause to search the Buick extended to the entirety of the vehicle, including the rear cargo area and spare tire. *Contra*. Doc. 36 at 22. The Tenth Circuit has plainly and repeatedly held that the smell of raw marijuana in a motor vehicle gives the officer probable cause to search the trunk of a vehicle. *Phillips,* 71 F.4th at 823. Probable cause extends to the entirety of the rear cargo area, including the spare tire. *United States v. Vasquez,* 555 F.3d 923, 930 (10th Cir. 2009) (quoting *United States v. Chavez,* 534 F.3d 1338, 1345 (10th Cir. 2008)) ("Once the officer[s'] suspicions rise to the level of probable cause, they are empowered to search the entire vehicle, including the trunk and all containers therein that might contain contraband."); *United States v. Rosborough,* 366 F.3d 1145, 1153 (10th Cir. 2004) ("[C]anine alert toward the passenger area of a vehicle gives rise to probable cause to search the trunk as well.").[11]

Blair and Simpson's argument to the contrary is misplaced. The only authority they cite is *United States v. Jackson,* 2024 WL 3510300 (N. D. Okla. July 23, 2024). Doc. 36 at 2. That case is inapposite: *Jackson,* a non-binding district court case, *see Camreta v. Green*, 563 *U.S. 692, 709 n.7*, supports the Government's argument that probable cause extends to the rear cargo area. *Jackson,* 2024 WL 3510300 at *5. It held that the smell of marijuana provided probable cause to search the passenger compartment of the vehicle, recognized that an SUV's rear cargo is a part of the passenger compartment, and permitted the officer to search that area based on probable cause. Nothing about *Jackson* supports Blair and Simpson's argument that probable cause did not extend to the rear cargo area of their Buick, a comparable SUV.

**III**

For the foregoing reasons, Blair's Motion to Suppress, Doc. 36, is DENIED.

---

[11] Blair and Simpson conceded at the hearing that because the stop was lawful, and Blake's smell of raw marijuana gave him immediate probable cause to search the vehicle. Consequently, *Rodriguez* and concerns about prolonging the stop are inapplicable. *Rodriguez v. U.S.,* 575 U.S. 348, 355 (2015) (noting seizures where unrelated inquiries do not extend the stop are lawful).

It is so ordered.

Date: November 19, 2026

s/ Toby Crouse
Toby Crouse
United States District Judge